## ANDRUS v. INDUSTRIAL LUMBER CO., Inc.

### No. 1010.

Court of Appeal of Louisiana. First Circuit.

June 8, 1932.

Julius T. Long, of Shreveport, for appellant.

Thornton, Gist & Richey, of Alexandria, for appellee.

### MOUTON, J.

Plaintiff was employed by defendant company as a carpenter in the erection of a hotel at Elizabeth, La.

He alleges, that on February 26, 1931, while working in that capacity, he was struck on the left side of his head with a piece of timber or lumber, which impaired and bruised his nerves, tissues, and blood vessels in that area, causing serious permanent injury to his head, neck, nerve, and brain; that since the injury he has been wholly and permanently disabled from doing work of any reasonable character; and is asking compensation for a weekly wage of $15.60 for four hundred weeks.

Judgment was rendered rejecting his demand, from which he appeals.

Plaintiff, in giving an account of how he was injured, testifies that they were putting up the ceiling with ship lap 1x6; that Mr. Johnson, who was working in the erection of the building, handed a board or piece of lumber to Mr. Williams, who changed it around, and that the end of the board struck him on the front of his head, at a point about three and a half or four inches from his ear. Upon his counsel stating, "Not that far," plaintiff corrected himself, and said, "a couple of inches."

Continuing in his testimony in reference to the place where he claims the injury was inflicted, he said it was back in the hair, slightly to the front of the head from the ear.

The district judge in his written opinion says: "He received a blow from a plank on the left side of the head, about two inches above; and slightly to the front of the ear."

We shall proceed in the discussion and solution of the case on this finding of fact by the district judge in which there is certainly no overstatement in reference to the distance between the ear of plaintiff and the point where he was struck.

We have referred with particularity to the foregoing, because, if plaintiff had received a blow three and a half or four inches from his ear, as was first stated by him, there could not, according to the evidence, have been any possible causal connection between the injury and the trouble of which he complains as the basis of his claim in compensation.

He was working on a scaffold with Mr. Johnson, Mr. Togleman, and Mr. Williams when he was hit by Mr. Williams with the end of the board, but who was not present when the case was tried, and did not testify.

The testimony of plaintiff is that he did not fall from the scaffold when struck, but that he fell against the wall of a partition they were putting up; that he got down, washed his face, then about 10 o'clock in the morning, went back to his job, and worked until night, but suffering death all the time.

Mr. Johnson, witness for plaintiff, says he knows plaintiff got a glancing lick on the side of his head that knocked his hat off; that is all he saw; and that plaintiff did not wabble.

Mr. Miller, supervisor of the work and who had hired plaintiff, says he made no complaint whatsoever of injury to him, and of which he heard for the first time several months after, when it was rumored that he was going to enter suit against defendant company.

Plaintiff says, the morning after the accident, he asked Mr. Togleman, one of the carpenters, to tell Mr. Miller, the foreman and supervisor, that his head was hurting him "too bad," and that he could not go back to work. Mr. Miller testifies that Mr. Togleman told him plaintiff was not able to come, was not able to work, but that no mention of any injury to plaintiff was made, and that he thought plaintiff would not return on account of an ear trouble.

The third day after the accident, plaintiff says, he was driven in Mr. Carroll's car to Elizabeth at the hospital to see Dr. Wade, one of the physicians of defendant company, who prescribed some medicine to "ease his head."

This visit to Dr. Wade was therefore in the first days of March, as the accident occurred on the 27th of February, although alleged to have happened on the 26th.

Dr. Wade says he examined plaintiff's ear and found a mild catarrhal condition or infection. His testimony is that plaintiff did not complain of any lick or trauma on his head, said nothing about that, and that there was no indication of any such injury, nor symptoms thereof. Dr. Wade says he was complaining of a pain in his ear, and that he never attributed his ear trouble to a lick on the head.

Dr. Mangham, physician for defendant company at the Elizabeth Hospital, also had occasion to examine plaintiff, and believed, though he is not certain, that the examination was made in March. This physician says plaintiff made no reference to any injury resulting from a blow or lick on his head, and that he saw no indication that such an injury had been inflicted.

Dr. D. C. Iles of Lake Charles, specialist in eye, ear, nose, and throat troubles, to whom plaintiff applied for relief, says that plaintiff first came to him March 30, 1931, and said he had been treated by Dr. Mangham. This statement of plaintiff to Dr. Iles shows that Dr. Mangham had attended to him in March, 1931, about which, as to time, he expressed some uncertainty, as hereinabove remarked. This expression of doubt by Dr. Mangham shows that he was not solicitous about testifying in the interest of defendant company, though one of its regularly employed physicians. It may therefore be accepted as true that plaintiff, when examined by Dr. Wade three days after the accident, and by Dr. Mangham later in March, did not tell them he had received a lick on his head, and that

there was no indication whatsoever that he had suffered such injury.

Dr. Iles, who first saw plaintiff on March 30, 1931, says plaintiff told him he had got a lick on the side of his head, but testifies that there was no objective evidence of head injury, or any injury to his ear from trauma. Later, in October, 1931, he was examined by Dr. Holcombe, who found no evidence of any lick having been inflicted on plaintiff's head. None of the other physicians, who examined plaintiff about that time, found any objective symptoms of any such injury.

The testimony of the plaintiff is that, although he returned to work and worked until night after receiving the blow, he was, however, suffering with excruciating pains; that, after taking the medicine prescribed for him by Dr. Wade three days after the accident, was in bed about thirteen days, went back to work suffering all the time, and finally "got so bad off" he had to "quit" work.

According to the character of such testimony, the blow plaintiff received would have been extremely severe, and we think would have left marks indicating, at least, slight physical injury, which would have been detected by Dr. Wade on his examination three days after the accident or by Dr. Mangham, whose examination was made later in the month of March.

Mrs. Didora Andrus testifies in the case. Her testimony is that plaintiff, while sitting on the porch, made some sort of an exclamation, and, upon being asked what was the matter, said, "There is a stick in my head," and then told her "he had got struck in the head." On cross-examination she said that it was a little stick, but was larger than a splinter, and that her little daughter "pulled it out."

It occurs to us that a cut in the skin or abrasion would necessarily have resulted from this little stick which was still there, according to Mrs. Andrus, after plaintiff had returned home from his work, and would have left some physical evidence that could not have escaped the attention of Dr. Wade. We really believe there would have been some slight traces left of the cut in the skin when Dr. Mangham made a subsequent examination. The logical inference to be drawn from the facts and circumstances, above referred to, is that the blow was neither serious nor severe, and was merely a glancing one as described by Johnson, plaintiff's witness, and which resulted in the knocking off of his hat, indicating that it was certainly not received nearer than about two inches from his left ear, as was found by the district judge.

It is perhaps possible, but assuredly not probable, that such a blow could have seriously and permanently injured plaintiff's tissues, bones, and blood vessels in the area where inflicted, affecting his nerves, neck, head, and brain upon which this demand is

grounded, according to the allegations of plaintiff's petition.

Obviously, though the blow did not produce the results as described in plaintiff's petition, still, if it brought about the trouble which plaintiff claims he was suffering with at the time of the institution of this suit, he would be entitled to recovery.

Plaintiff, on his visits to Drs. Wade and Mangham, and without making any reference to the injury to the side of his head, complained of pain in his left ear. These physicians, having failed to relieve him, sent him to Dr. Peters of Alexandria, a specialist in eye, ear, and nose diseases, who, after examining plaintiff, wrote Dr. Mangham that plaintiff had mastoiditis and advised an operation. This physician said nothing about the cause of plaintiff's trouble.

Dr. Wade or Mangham referred plaintiff to Dr. Iles, ear, nose and throat specialist, hereinabove mentioned, for whom X-ray pictures were taken of plaintiff's trouble by Dr. McKinney, radiologist.

Dr. Iles testifies that he got the history of the case from plaintiff who told him he got a lick on his head two or three inches above his ear, and who later performed the operation for mastoiditis.

Plaintiff was found by Dr. Iles to be suffering with mastoiditis or an abscess or infection of the left ear. If such an abscess were due to trauma, Dr. Iles says some direct force would have had to be applied to the eardrum. He saw no evidence whatsoever of any such force applied to the ear of the plaintiff, and no puncture of the eardrum. The fact is, as hereinabove remarked, he found no objective symptoms of any injury to plaintiff's head or to his ear.

It is true Dr. Iles said there were always two causes for mastoiditis; one the result of a cold, the other, trauma.

Here the whole theory of the case advanced by plaintiff is that it was not the result of a cold, but that it had been caused by a trauma as appears from the allegations of his petition, and the evidence he offered in the case. We must therefore look into the case to see if the trouble was a traumatic mastoiditis.

Speaking of a case of that character, Dr. Iles says: "I would expect it to be a traumatism such as a fracture of the skull, through the mastoid bone, or a mashing of the mastoid bone itself, breaking off."

It is needless to say, as appears from the evidence of the case coming from the testimony of all the witnesses, either for plaintiff or defendant, that there was no fracture of the skull, or of the breaking or smashing of the mastoid bone which could possibly have resulted from the blow plaintiff received, even taking as true the account he gave of the occurrence. It is therefore certain, from the testimony of Dr. Iles, that plaintiff suffered no traumatic mastoiditis.

Further in the examination, Dr. Iles was asked if it were possible or probable that a man receiving a lick two or three inches above the ear, while standing on a scaffold, not knocked nor unconscious, without the result of a fracture or clinical X-ray evidence of injury, could be expected to have an infected ear or mastoid caused from that trauma. He answered: "I do not." It will be observed that his answer to that question is that it is neither possible nor probable.

It is proper to say, in connection with the question above referred to in which reference is made to X-ray evidence, that the radiologist, Dr. McKinney, who took the pictures of plaintiff, one as early as April, testifies that these pictures do not reveal anything indicating any trauma or cranial injury of any nature. It is also proper to say here, that the answer of Dr. Iles, above quoted, gives the inference he drew from the statement of the plaintiff to him about the history of the injury and from what appeared in the pictures of the radiologist.

Dr. Iles was again asked if the blow, as described by plaintiff, could possibly or probably have caused the ear infection with which he was suffering, without rupturing the eardrum. His answer is: "No, it is impossible to do it." The word "impossible" is used here by this medical expert, and we cannot conceive of any expression that could be more emphatic and positive.

Dr. Holcombe, expert for plaintiff, made an examination of plaintiff some time in October, 1931, after the operation had been performed by Dr. Iles.

His testimony is that there was no evidence of there having been any lick or blow to plaintiff's head, at all. He only found evidence of the operation which had left its marks on the mastoid bone. His testimony is that he never saw a case where a lick on the side of the head had resulted in a mastoid or infected ear, or any mastoiditis from trauma.

The radiologist whose line of investigation does not carry him into examinations for the discovery of clinical symptoms of diseases says, however, that the evidence from the X-ray pictures did not indicate an infected ear or a condition due to trauma on the left side of plaintiff's head.

Counsel for plaintiff propounded to Dr. Hargrove, plaintiff's medical expert, three hypothetical questions in line with his contention that the trouble with which plaintiff was suffering was the result or consequence of the blow he had received. In answer to the first question, Dr. Hargrove said he would give an hypothetical answer thereto, and said it was possible that the condition of the plaintiff had been brought about by the injury. To the second hypothetical query, the doctor

said he recalled an instance in his experience where a reasonably slight injury had resulted in a condition similar to that of plaintiff "and which had culminated in the death of the individual." Continuing, he made this significant observation: "The conditions brought about in that case were evidently due to the blow and his death was evidently due to those conditions brought about by the blow. In this case, it could be possible that all these conditions followed his injury, and were a result of his injury, in my opinion."

In the case referred to in the above excerpt from Dr. Hargrove's testimony, it will be noted that he says, "The conditions brought about in that case were evidently due to the blow," etc.

There is no such proof in this case.

To the third hypothetical question which was along similar lines, Dr. Hargrove again answered that it was possible, to which counsel for plaintiff said: "Couldn't you use the word 'probable.' It is so much stronger." I mean "possible or probable," Dr. Hargrove answered.

On cross-examination Dr. Hargrove was asked this pointed question as to whether a lick on the left frontal part of a man's head, without rupturing the eardrum, could cause an infection in his ear. His answer to that question is as follows: "I don't think that outside of a jar to the ear drum, a rupturing of the ear drum. I don't know whether it would or not. I can't positively say." Continuing, he says it is just a case that is problematical.

In the instant case there was certainly no rupturing of the eardrum, not even any jarring of it, as appears from the examinations first made by Drs. Wade, Mangham, and Iles, and which are always considered the most reliable, as appears from the evidence of practically all the medical experts who testified in this litigation.

As there was no rupture of the eardrum or any jarring of it, even under the testimony of Dr. Hargrove, it is extremely doubtful if the blow plaintiff says he received could have resulted in the infection of his left ear.

The depositions of Drs. Thomas, Potts, and Rigby were taken in behalf of plaintiff in the parish of Caddo, by a notary public, in October.

Dr. Thomas was asked whether the infection of which plaintiff complained was caused by trauma or a diseased condition. He answered, if the "blow was sufficient and lacerated the ear drum I would say yes." Evidently his "yes" meant if the trauma was sufficiently violent for the laceration of the eardrum.

Dr. Potts testified that he thought the blow was the cause of the mastoid affection of which plaintiff suffered. He then said:

"First, his ear drum might have been ruptured at the time of the blow and overlooked by the doctor." This assumption of Dr. Potts that the rupture might have been overlooked was entirely wrong, as it clearly appears that plaintiff's eardrum was never punctured or even jarred by the blow he experienced.

The fact that these experts of the plaintiff refer to the infection of the ear or mastoiditis as being the possible consequence of the rupturing of the eardrum shows that they agree, at least, in this instance, with the experts of defendant company, that the eardrum must be affected by force to bring about the condition of which plaintiff complained.

The three experts of plaintiff and most of the experts for defendant company say that such affections of the ear are the usual result of common colds, flu, or throat diseases. In that respect there seems to be some agreement between these medical experts.

Counsel for plaintiff refers to the expert testimony of Drs. Thomas, Potts, and Rigby to the effect that the rule is that these ear infections are bilateral or on both sides. From that he deduces the conclusion that, as only the left ear of the plaintiff was affected, his trouble of necessity must have been the result of a trauma. These physicians nowhere said that this bilateral affection was invariably or absolutely the rule. On the contrary, their testimony clearly indicates that such affections usually appear on both sides, about which Dr. Thomas said there might exist differences in opinion. The medical experts for defendant company did not testify on this subject, and made no allusions to the bilateral affections to which we have referred.

It is important in passing on the opinion of these medical experts on this question to take note of what Dr. Thomas, expert for plaintiff, said in reference to the examination of infected ears. He frankly stated that the "general practitioners never waste much time with the ears, we always left the specialists do that."

In illustrating this statement and referring to himself, he says: "While treating patients for chills, malaria and fever he sent them to specialist who found they had abscess of the middle ear," and concludes by saying: "I made more mistakes in ears than in anything else."

He is supported in that conclusion by the proof in this record which shows that Drs. Wade and Mangham, physicians for defendant company, and general practitioners, after failing to relieve plaintiff, sent him to Dr. Peters, ear specialist, who found he had mastoiditis, and directed an operation, and which was subsequently performed by Dr. Iles, another ear, eye, and nose specialist.

Considering the testimony of Dr. Thomas in reference to the qualification of general practitioners in relation to ear affections, and

to the inability, as appears by the record, of Drs. Wade and Mangham to correctly diagnose the trouble which afflicted plaintiff, we will to a large extent be guided by the evidence of Dr. Iles, the specialist, in the solution of this case.

The testimony of this expert, from which we have hereinabove quoted copiously, shows that there could be no causal connection whatsoever between the injury plaintiff experienced as related by him to Dr. Iles, and the ear infection or mastoiditis which required an operation. The testimony of Dr. Iles with the support it finds in the evidence of Dr. Holcombe and the radiologist, Dr. McKinney, also indirectly in the testimony of Dr. Hargrove, expert of plaintiff, leads to the conclusion that the proof fails entirely to show that the injury plaintiff alleges he suffered, or that which he claims he was suffering with, was the result of the glancing blow that he received while in the employment of defendant company.

In the course of the examination of Dr. Hargrove, counsel for plaintiff deviated from the whole theory of this case and asked him if it appeared that, if plaintiff was suffering with some kind of latent disease in the ear or nostrils, whether a heavy blow in that area might accelerate that condition. Dr. Hargrove answered it would.

In the petition of the plaintiff there are no averments indicating that he was suffering with any pre-existing ear trouble. In the evidence offered by plaintiff, his own testimony, that of his wife and other witnesses, was directed entirely to his persistent effort to show that he was altogether free of any trouble prior to the accident in question.

There was no evidence offered by defendant on this issue of the probable activating or accelerating of a prior latent disease, probably because the whole theory of the case excluded that idea. The testimony of defendant's medical experts was taken before a notary on October 26, 1931, three days before the trial of the case, and no questions were asked them about any aggravation of a pre-existing latent disease of the plaintiff, evidently because no suggestions of that nature appeared in plaintiff's petition.

There is therefore no medical evidence on this subject by the expert evidence of defendant company, and little from the experts of the plaintiff, including what Dr. Hargrove had to say on the subject.

The testimony is therefore meager on this question, and what there is of it is entirely insufficient to show the acceleration of a prior trouble caused by the effect of the blow.

The testimony of Johnson, plaintiff's witness, shows that he had an infected ear prior to the accident. The district judge so concluded, and expressed himself as follows on that subject: "Only in case the blow had an appreciable effect in activating or hastening its results can the plaintiff recover."

In concluding his opinion, the district judge said there was no evidence, other than the mere concurrence of pain with the time of the blow, and the subsequent development of the ear and mastoid trouble, to connect its development with the blow as an activating agent.

So far as the record discloses, "the catarrhal condition of the inner ear proceeded normally to its normal and expected results."

In this finding we concur, and find no acceleration or aggravation in the condition of the plaintiff traceable to the blow, nor that the blow was the original cause of his trouble for the reasons hereinabove given.

The demand of the plaintiff was correctly denied.

Judgment affirmed.